[Crim. No. 2925. Fourth Dist., Div. One. Apr. 25, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERTO PONCE PALACIOS, Defendant and Appellant.

Jonathan C. Gibson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald F. Russo, Deputy Attorney General, for Plaintiff and Respondent.

WHELAN, J.—Defendant appeals from a judgment imposing sentence after he had been found guilty in a nonjury trial of theft from the person and of having suffered a previous felony conviction. A codefendant, Flores, also found guilty of theft from the person, has not appealed.

At about 10:30 a.m. on Sunday, March 5, 1967, one Fowler, already suffering from having looked too long upon the wine when it was red, and probably sweet, sat on a bench in Horton's Plaza in downtown San Diego. While Fowler sat there a young man identified as Flores sat beside him; another young man, the defendant, came up and sat on a bench on the other side of a sidewalk that separated the two benches; shortly thereafter Fowler stood up, walked a short distance and lay or fell down "bottom up." Flores and Palacios went to the recumbent man where Flores, in Spanish, told Palacios the wallet was in Fowler's rear left pocket. Palacios extracted a wallet from Fowler's pocket, placed it in a white cap that had been taken from Fowler's head; left the Plaza with Flores; crossed Plaza Street, which runs along the south side of the Plaza; ran south down the west side of Fourth Avenue, a north-south street adjoining the Plaza on the east; crossed E Street, the next east-west street to the south; continued south along Fourth Avenue and entered the Barbet bar about half-way along the block between E and F Streets.

All of the foregoing was seen and heard by Scott, who was seated on the same bench as Fowler and Flores and who spoke and understood the Spanish language. When he heard the conversation in Spanish, Scott walked over to Plaza Street and spoke to Lawrence Shanley, a San Diego policeman seated in a car parked on Plaza Street, to whom he reported that a man was being robbed. It was while he was at the car with Shanley that Scott saw the wallet being taken from Fowler's pocket; Scott then went after the defendant while Shanley apprehended Flores.

Scott waited outside the Barbet until Shanley arrived; also there was Frostad, a U. S. Marine Corps private, whose testimony will be mentioned.

Inside the Barbet bar, besides the bartender, were defendant and two middle-aged men dressed in working-men's clothes. Scott had noticed earlier that defendant wore a plaid sport jacket and a necktie and was neatly dressed. He recognized defendant as the man who took the wallet, and pointed out defendant to Shanley, as did Frostad. Defendant was arrested and searched. No wallet was found on him; Fowler's wallet in the cap was found in a trash can on the sidewalk outside and north of the Barbet; it was on top of all the other contents of the can.

Frostad had been standing in one of two telephone booths that stood in the Plaza and through the glass side of the booth had seen two men kneeling alongside a third man, who was prostrate; one of the kneeling men was near the head of the prone figure, the other nearer his feet; one of them put a hand in the right rear pocket of the fallen man and pulled out a wallet; the two kneeling men stood up; one of them, Palacios, had a wallet in his hand which he put into a white hat, then went out of the Plaza to the corner and down Fourth Avenue. Frostad took after defendant, who, when Frostad saw him next, was about midway in the block between E and F Streets and who entered a bar about there. Frostad went to that point and waited until the police arrived, entered the bar with the police, saw defendant inside, whom he recognized as the man who had put the wallet into the hat. Frostad made no attempt to identify Flores as the second man.

Flores testified that he had been in the Plaza that morning; had had a conversation with Palacios while both sat on a bench; saw Palacios walk away from the bench; saw also another person, a Mexican in appearance, having like himself a moustache and of about the same height but of heavier build, and who was described as being in the general area in which the theft occurred.

Frostad's testimony at trial was given by the reading of the transcript of his testimony at the preliminary hearing.

## CONTENTIONS ON APPEAL

Defendant bases his appeal upon the following contentions:

1. That defendant was denied the right to effective counsel in the municipal court because he and Flores were represented by the same counsel until after the preliminary hearing, although the joint counsel had, before the preliminary hearing, requested the appointment of separate counsel for one or the other of the defendants.

2. That because defendant did not have separate

counsel at the preliminary hearing, he was denied the right to confront and cross-examine the witness Frostad whose preliminary hearing testimony was received in evidence in the superior court in the absence of the witness.

 3. The trial court erred in finding that defendant had suffered a prior felony conviction.

Those contentions are made against the following factual background:

Mr. Webb, who represented both defendants at the preliminary hearing, was first appointed as their counsel on March 8; on March 15 he moved to have separate counsel appointed; on March 16 the matter was discussed with the presiding judge of the municipal court in the following exchange:

"MR. WEBB: Your Honor, this is a motion on my behalf to have another attorney appointed. I feel it would be in the best interest to have another attorney appointed for one of the Defendants.

"THE COURT: You feel that there is a conflict of interest?

"MR. WEBB: Well, your Honor, not at this time but due to the fact that there may be a possibility later on of a conflict, I felt it would be best at this time.

"THE COURT: I am afraid I don't quite understand your motion. It is not unusual to ask to appoint an attorney for another defendant but if you are not prepared to say there is a conflict of interest, why should I appoint another attorney?

"MR. WEBB: Well, your Honor, from interviewing both of them, that is the feeling that I have, that it would be in the best interest for them. There seems to be no conflict at this point but I think that they do not know.

"THE COURT: You are appointed on both of them?

"MR. WEBB: Yes.

"THE COURT: You see no conflict, what conflict is going to arise? If you don't see one—

"MR. WEBB: I don't know, your Honor.

"THE COURT: Motion denied. You will continue to represent both of them."

When the case was called for preliminary hearing on April 4, Mr. Webb announced himself ready to represent both defendants, without bringing to the attention of the magistrate any claimed conflict of interest.

Before the taking of any testimony at the preliminary hearing, the district attorney moved to file an amended complaint charging Palacios with a robbery allegedly committed on February 23, 1967. Mr. Webb and Palacios both had been advised

previously that such motion would be made. Palacios was arraigned on the additional charge and the hearing proceeded on the amended complaint, with cross-examination by Mr. Webb of the witnesses who testified as to each of the charged offenses.

After both defendants had been ordered bound over for trial, the following occurred before the committing magistrate:

"MR. WEBB: I think there has been a conflict of interest here, and I would request the Court to appoint an attorney—another attorney to represent one of the Defendants. I think—I know there will be a conflict of interest.

"THE COURT: What would be the conflict of interest?

". . . . . . . . . . . .

"MR. WEBB: Well, the nature of the conflict is that one may be trying to put the blame on the other.

". . . . . . . . . . . .

"MR. WEBB: Would you like me to make the motion in the Superior Court, your Honor?

"THE COURT: Well, that might involve further delays up there. I think we will reopen the case in this Court for the purpose of appointing Counsel.

"Which Defendant do you expect to continue representing?

"MR. WEBB: It makes no difference to me, your Honor."

Thereafter each defendant was represented by separate counsel.

At the trial, when the district attorney laid a foundation for the use of Frostad's preliminary hearing testimony, defendant's trial counsel objected on the ground now urged for reversal, and offered to show by the testimony of Webb the making and denial of his motion for the appointment of separate counsel on March 15 and 16. The offer of proof was rejected.

There were no proceedings in the superior court under section 995, Penal Code, to test the regularity of the preliminary proceedings leading to the binding-over for trial in superior court.

FIRST CONTENTION

It is held in *People* v. *Harris,* 67 Cal.2d 866 [64 Cal.Rptr. 313, 434 P.2d 609], that attack upon the preliminary proceedings on the ground of failure to provide counsel for defendant at the preliminary hearing must be made under section 995, Penal Code, or it is waived. The lack of adequate

representation, therefore, in itself, may not now be successfully urged.

We may observe that if there had been a conflict of interest between defendant and Flores, it could hardly have been determined before the committing magistrate had heard the evidence. Even then, no conflict appeared; neither defendant testified at the preliminary hearing.

In fact, the conflict of interest between Flores and defendant did not appear until Flores took the stand to interject the theory of a third man of Mexican appearance with the suggestion that the third man may have paired off with defendant to commit the theft.

It is possible that the conflict in interest had its inception when Frostad testified he could not identify Flores. Scott, who identified both defendants, did not testify at the preliminary hearing.

The direct testimony and cross-examination of Frostad at the preliminary hearing had to do almost exclusively with defendant Palacios rather than with Flores; if anyone might have complained about the cross-examination of Frostad, it would have been Flores; but it cannot be said that his interests were not adequately looked after since Frostad could not identify him.

The direct examination of Frostad occupied 15½ pages of the preliminary transcript; cross-examination, 22 pages; redirect examination, 7 pages; recross-examination, 3 pages.

The record does not disclose that defendant was deprived of adequate representation at the preliminary proceeding, either by reason of the fact that his counsel represented Flores also, or otherwise.

### SECOND CONTENTION

It is obvious that a denial of the right to cross-examine a witness at the preliminary hearing takes on a different aspect if the testimony of that witness given at the preliminary hearing is used in his absence at the trial. The actual denial of the right of cross-examination in such situation is a denial of the right of confrontation guaranteed by the Sixth Amendment of the federal Constitution (*Pointer* v. *Texas*, 380 U.S. 400 [13 L.Ed2d 923, 85 S.Ct. 1065]).

In such circumstances, a failure to test the regularity of the preliminary proceedings under section 995, Penal Code, is not a waiver of the right to claim irregularity in such proceedings based upon the denial of the right of cross-examination. This is so because, until the time of trial, the defendant probably will not know of the absence of a witness whose preliminary testimony will be used.

■ If, however, the right to cross-examine the absent witness were accorded the defendant and exercised by him in a full-scale preliminary hearing, then the only question remaining is whether the conditions existed that permit the use of the prior testimony of an absent witness.

Section 1291, Evidence Code, now governs procedurally as to the conditions under which former testimony may be used. It provides in part as follows: ''(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and:

'' . . . . . . . . . . . . .

''(2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.''

Section 240, Evidence Code, provides in part as follows:

''(a) Except as otherwise provided in subdivision (b), 'unavailable as a witness' means that the declarant is:

'' . . . . . . . . . . . . .

''(5) Absent from the hearing and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance by the court's process.'' .

The question whether it has been satisfactorily shown that the prosecuting witness could not with reasonable diligence be found within the state was one primarily addressed to the trial judge to be determined by him from the evidence presented. It is a question of fact, the determination of which by the trial judge will not be interfered with unless the appellate court is satisfied that the trier of fact abused the discretion lodged in him in determining that due diligence had been used and that the witness could not be found. (*People* v. *Dozier*, 236 Cal.App.2d 94, 102 [45 Cal.Rptr. 770].)

No showing has been made here that the trial court abused its discretion in finding that there had been due diligence to obtain the presence of a witness, and of his nonavailability.

The suggestion was made in the court below that the prosecuting attorney should have served a subpoena on Frostad at the time of the preliminary hearing; since no trial date had then been set, a subpoena to appear on the trial date could not have been issued at the time of the preliminary hearing. [6] ■ It is not required that diligence be exercised to retain a witness in the state *(People* v. *Carswell,* 51 Cal.2d 602 [335 P.2d 99].)

All of the cases cited by defendant involving a right to counsel or a finding of a denial of such right where separate counsel is not appointed for one of several defendants whose interests conflict have to do with proceedings in the trial court. (*People* v. *Manchetti,* 29 Cal.2d 452 [175 P.2d 533]; *Glasser* v. *United States,* 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457]; *People* v. *Lanigan,* 22 Cal.2d 569 [140 P.2d 24, 148 A.L.R. 176]; *People* v. *Robinson,* 42 Cal.2d 741 [269 P.2d 6].)[1]

Had only Flores been represented by counsel at the preliminary hearing, there would have been a situation much like that in *Motes* v. *United States,* 178 U.S. 458 [44 L.Ed. 1150, 20 S.Ct. 993].[2] ▓▓▓ The record before us, including the transcript of the preliminary hearing, demonstrates that defendant was well and ably represented at that hearing, and had full opportunity to, and did, cross-examine Frostad without interference or abridgment; no occasion presented itself during the preliminary hearing that called for the use of different tactics on behalf of one defendant from that used on behalf of the other; counsel at that stage was not called upon to make a choice between serving the interest of one over that of the other.

No abuse of discretion appears in the trial court's ruling on the permissibility of reading into evidence the testimony of Frostad given at the preliminary hearing.

### THIRD CONTENTION

The information charged that defendant, on September 24, 1962, had been convicted of a violation of section 288, Penal Code, and that in pursuance of that conviction he was committed to the California Youth Authority.

▓▓▓ The argument is made that a crime becomes a felony only when a guilty defendant has been sentenced to the state prison; that since commitment to the Youth Authority is not a commitment to a state prison, defendant was guilty of only a misdemeanor.

In making that argument, counsel is not unmindful of the provisions of section 17, Penal Code, which in part are as follows: "A felony is a crime which is punishable with death

---

[1]The defect in *People* v. *Robinson* was not that both defendants were represented by the same lawyer at the preliminary hearing. For that reason, they have no application to the present case.

[2]In *Motes,* two of the defendants on trial had been made defendants after the preliminary hearing, at which they had not been represented because they were not then defendants.

or by imprisonment in the state prison. Every other crime is a misdemeanor. When a crime, punishable by imprisonment in the state prison, is also punishable by fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes after a judgment imposing a punishment other than imprisonment in the state prison. Where a court commits a defendant to the Youth Authority upon conviction of a crime punishable, in the discretion of the court, by imprisonment in the state prison or fine or imprisonment in a county jail, the crime shall be deemed a misdemeanor. . . ." He contends, however, that the specific mention in section 17 of commitment to the Youth Authority as an automatic reduction to a misdemeanor in the case of a crime made punishable either by imprisonment, jail sentence or fine is not exclusive; that since no commitment to the Youth Authority is a prison sentence, a defendant committed to the Youth Authority for whatever crime, including those declared to be punishable only by death or imprisonment, has had imposed upon him a punishment other than by imprisonment. A violation of section 288, Penal Code, is punishable only by imprisonment.

Commitment to the Youth Authority and the completion of a period of commitment in one of its facilities do not constitute the serving of a prison term within the meaning of section 644, Penal Code, so as to furnish a part of the basis for a finding of habitual criminality. (*People* v. *Lockwood*, 146 Cal. App.2d 189 [303 P.2d 621].) Nor does such commitment to the Youth Authority, followed by an administrative transfer by the Youth Authority to a penal facility under the supervision of the Department of Corrections under section 1753, Welfare and Institutions Code, constitute the serving of a prison term within the requirements of section 644, Penal Code. (*In re Keller*, 232 Cal.App.2d 520 [42 Cal.Rptr. 921].)

The argument that one committed to the Youth Authority has had punishment imposed other than a prison sentence was dealt with in *People* v. *Williams* (1945) 27 Cal.2d 220 [163 P.2d 692], which held that commitment to the Youth Authority of a person convicted of a crime was not punishment and that one committed there for a crime punishable by imprisonment, as the law stood then, remained convicted of a felony for purposes of impeachment as a witness. The crime there involved was one punishable by imprisonment or jail sentence. *People* v. *Zaccaria*, 216 Cal.App.2d 787 [31 Cal.Rptr. 383], is to the same effect.

In 1947, section 17, Penal Code, was amended to read in part as follows:

"Where. a court commits a defendant to the California Youth Authority upon conviction of a crime punishable by imprisonment in the state prison or fine or imprisonment in a county jail, in the discretion of the court, the crime shall be deemed a felony until and unless the court, after the person committed has been discharged from control by the California Youth Authority, and only if he was not placed in a state prison by the authority during the period of such control, on application of the person so committed and discharged, makes an order determining that the crime of which he was convicted was a misdemeanor."

In 1959, section 17 was again amended so that as to a defendant committed to the Youth Authority the language of the section is as it now reads. In *People* v. *Aranda*, 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], the claim was made that one committed to the Youth Authority prior to the 1959 amendment for offenses then punishable by either imprisonment or jail sentence would not, after 1959, be held to have been convicted of a felony, although he had taken no steps after discharge from the Youth Authority to have the court determine that the crimes were misdemeanors. Although Aranda's conviction was reversed because of the use in a joint trial of the confession of a codefendant that implicated Aranda, the Supreme Court considered and ruled upon all contentions that might arise on a retrial. The proof of the prior felony convictions of Aranda was upon the question of the length of the sentence to which he might be subject. The court held that Aranda had been twice previously convicted of a felony; that the amendment to section 17, Penal Code, should not be given a retroactive application.

We are to determine whether a crime is a felony or a misdemeanor from section 17, Penal Code. We conclude that section 17, Penal Code, does not intend to extend to persons committed to the Youth Authority for crimes punishable only by death or imprisonment the grace of an automatic reduction of such offenses to misdemeanors. According to the definition of that section, defendant had a prior conviction of felony as found by the court.

Judgment affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied May 14, 1968, and appellant's petition for a hearing by the Supreme Court was denied June 19, 1968.